COUNTY COURT OF TAYLOR COUNTY *et al v.* BALTIMORE & O. R.
Co. *et al.*

(*Circuit Court, D. West Virginia.* June 16, 1888.)

**1. REMOVAL OF CAUSES—CITIZENSHIP—CORPORATIONS—FOREIGN—BALTIMORE &
OHIO RAILROAD COMPANY IN WEST VIRGINIA.**
The Baltimore & Ohio Railroad Company is a Maryland corporation, and
not a corporation created by any enabling act of Virginia or West Virginia;
the Virginia act of 1827 merely conferring upon such company a license to
transact business in the state, and is entitled to remove a cause begun in the
West Virginia courts to the Federal courts on the ground of citizenship.

**2. SAME—SEPARABLE CONTROVERSY.**
A bill was filed, the objects of which were—*First,* to restrain the B. & O.
company from using or transferring 1,160 shares of stock of the G. & G. Com-
pany; *second,* if the stock had not been issued, to restrain its issuance; *third,* to
enjoin the collection or negotiation of bonds transferred by the G. & G. Com-
pany to the B. & O. Company. It appeared that the G. & G. Company had
issued the stock, and transferred the bonds to the B. & O. Company, before
the commencement of the action. The G. & G. Company's answer adopted
the B. & O.'s answer, and showed that it had no interest in the controversy.
*Held* that, as it was unnecessary to notice the second prayer, the stock hav-
ing been issued, and as the only relief which could be granted was under the
first and third prayers, relating solely to the B. &. O. Company, the action
was separable, and the G. & G. Company not a necessary party.

**3. SAME—LOCAL PREJUDICE—PLEA.**
Under Acts Cong. 1887, c. 373, § 2, cl. 4, providing "that a removal shall
take place when it is made to appear to the circuit court that from prejudice
or local influence it [defendant] will not be able to obtain justice" in the
state courts, a plea by plaintiffs simply denying defendant's belief in the ex-
istence of such prejudice or local influence is insufficient, and raises no issue
on that question, as the plea should affirm that it does not exist.[1]

**4. CORPORATIONS—BOARD OF DIRECTORS—NOTICE OF SPECIAL MEETING—RATIFI-
CATION.**
Where action taken by a board of directors of a corporation at a special
meeting is ratified at a subsequent special meeting, of which all the members
of the board had legal notice, and at the next regular meeting, "The minutes
of the last two meetings were read and approved," it is immaterial whether
all the members of the board were legally notified of such first special meet-
ing, in the absence of fraud or conspiracy on the part of the officers or direc-
tors.

**5. SAME—INTEREST OF DIRECTOR IN CORPORATE ACT.**
The action of a board of directors of a corporation in delivering corporate
stock in payment of a portion of its indebtedness, and consolidating the re-
mainder into a mortgage on the corporate property, is not rendered illegal by
the fact that members of the board had become guarantors for further ad-
vances made to the corporation after it had exhausted its credit, which ad-
vances were to be paid by the delivery of the stock.

**6. SAME—DEALINGS BY ONE CORPORATION IN STOCK OF ANOTHER—ADVANCES
ON SECURITY OF STOCK.**
Where one corporation makes advances to another, taking as collateral se-
curity mortgage bonds of the latter, which it is unable to redeem, defaulting
in the payment of the interest, and thereafter such corporation makes fur-
ther advances secured by bonds and stock of the latter corporation, such
transaction is not within the prohibition of Code W. Va. forbidding one cor-
poration to subscribe for or purchase stocks, bonds, or securities of another
corporation except in payment of a *bona fide* debt.

---

[1] Respecting the removal of causes from state to federal court, under the act of 1887,
on the grounds of prejudice and local influence, and the sufficiency of pleading and affi-
davit in obtaining such removal, see Short v. Railroad Co., 33 Fed. Rep. 114; Hills v.
Railroad Co., Id. 81; Short v. Railroad Co., 34 Fed. Rep. 225.

In Equity.   Bill for injunction and other relief.
*B. F. Martin* and *Joseph Marum,* for complainants.
*John A. Hutchinson* and *Caleb Boggess,* for defendants.

JACKSON, J.   The pleadings and proofs in this case disclose that the Grafton & Greenbrier Railroad Company had constructed a railroad from Grafton to Philippi in this state, which was completed about the 1st day of January, 1883.   That during the construction of this railroad, it being represented to the Baltimore & Ohio Railroad Company that it would be an important feeder to their main line, at the request of the Grafton & Greenbrier Company the Baltimore & Ohio Company advanced it money, material, and property amounting to about $90,000.   That on the 19th day of October, 1883, the Grafton & Greenbrier Railroad Company executed a deed of trust or mortgage "on its railroad from Grafton to Philippi, and on all other property between these points then owned and thereafter to be acquired by it on this portion of its road," to secure 175 of its negotiable bonds of $1,000 each, making a sum total of $175,-000, which were to bear date the 1st day of January, 1884, due in 30 years after date, interest payable semi-annually.   After the execution of this mortgage, the Grafton & Greenbrier Company, finding it difficult to negotiate their bonds, made an application through their officers or agents to the Baltimore & Ohio Company to take a portion of the bonds secured by this mortgage.   As a result of the negotiations by the officers of the two companies, the Baltimore & Ohio Company concluded to take $120,000 of the first mortgage bonds of the Grafton & Greenbrier Company at 90 per cent. of their par value; that is to say, $120,000 in bonds at the price of $108,000, which was to cover and liquidate the advances already made by the Baltimore & Ohio Company, leaving a balance of $18,000 to be accounted for, and which, it is conceded, was accounted for in their future settlements.   That afterwards the Grafton & Greenbrier Company desiring to extend their road from Philippi to Belington, a distance 17 miles south of Philippi, at a stockholders' meeting of their company on the 28th day of December, 1886, they decided to borrow a sum of money for that purpose, not exceeding $250,000, and to issue its coupon bonds at 6 per cent., to run 30 years, upon which to raise money.   At the same meeting it was determined also to extinguish the existing mortgage upon the property, and take up the bonds secured by it with the bonds to be issued under the new mortgage, which was to be known as the "first consolidated mortgage."   This mortgage was executed on the 20th day of January in the year 1887, and placed upon record on the 10th day of March following.   That prior to the execution of this mortgage a committee of directors of the Grafton & Greenbrier Company, composed of John W. Mason, Mr. Hall, and Mr. Whitescarver, applied to the Baltimore & Ohio Company again, to secure further aid to construct the proposed extension to Belington; and in an interview between the committee and Mr. Spencer, vice-president at that time, of the Baltimore & Ohio Company, the propriety of the Grafton & Greenbrier Company making a consolidated mortgage to cover not only its ex-

isting line, but its proposed extension, was discussed, and as a result of such discussion, it was made to take the place of the first mortgage, and to secure further aid for the proposed extension.   The evidence discloses the fact that sundry interviews took place between the officers and agents of the two companies in reference to the proposed aid of the Baltimore & Ohio Company to the Grafton & Greenbrier Company.   That an understanding was supposed to have been reached between Mr. Spencer and Mr. Mason, representing the two companies.   That subsequently it was discovered that there was a misapprehension as to the terms of the agreement that they had made, as it had not been reduced to writing. That with a view of adjusting the matters of difference between the two companies, Mr. Samuel Spencer, the then vice-president of the Baltimore & Ohio Company, on the 6th day of April, 1887, made a proposition in writing to Mr. John Bradshaw, the president of the Grafton & Greenbrier Company, stating upon what terms the Baltimore & Ohio Company would lend further aid to the Grafton & Greenbrier Company, which proposition was accepted and acted upon by the president and directors of the Grafton & Greenbrier Railroad Company on the 7th day of April, 1887; and at that meeting the board of directors of the Grafton & Greenbrier Company appointed a committee, composed of John Bradshaw, its president, James E. Hall and J. Hop. Woods, two of its directors, to settle and adjust the accounts between the two companies.   That on the 14th day of April, 1887, the committee and Mr. Spencer, the vice-president of the Baltimore & Ohio Company, made a settlement, which was reported to the board of directors of the Grafton & Greenbrier Company on the 27th day of April, called by its president, all of whom had due notice, and nine of whom were present, as appears by the minutes of that date, and at that meeting the settlement made by the committee and Vice-President Spencer was by unanimous vote ratified and confirmed. In consequence of this action on the part of the Grafton & Greenbrier Company, the Baltimore & Ohio Company surrendered $120,000 of the first mortgage bonds it held of the Grafton & Greenbrier Company, which were canceled and destroyed, and received in lieu thereof $120,000 of the first consolidated bonds, and in addition thereto $116,000 in stock of the Grafton & Greenbrier Company, which was to cover the then indebtedness of the Grafton & Greenbrier Railroad Company to the Baltimore & Ohio Company, as well as the advances made for the construction and equipment of the extension of the line, at the rate of $1,000 per mile, at 90 per cent. of the face value thereof, and an equivalent amount of stock; all of which is embodied in the contract ratified by the board of directors on the 27th day of April, 1887.   This settlement showed a balance of $22,500 in favor of the Grafton & Greenbrier Company, which was subsequently paid by the Baltimore & Ohio Company. It further appears that a regular meeting of the president and board of directors of the Grafton & Greenbrier Company was held on the 15th day of June following, at which meeting there was present 11 of the 12 directors, when "the minutes of the two preceding meetings were read and approved."   Several other meetings of the board of directors were

sebsequently held, at which they directed the proper officer of the company to pay the interest due the Baltimore & Ohio Company upon the bonds that it held of the Grafton & Greenbrier Company.

The complainants filed their bill on the 8th day of December, 1887, in the circuit court of Taylor county, in this state, and upon this state of facts they prayed, among other things, that the Baltimore & Ohio Railroad Company, and its officers and agents, be restrained from voting, or otherwise using or transferring, 1,160 shares of stock of the Grafton & Greenbrier Company, and that the company be enjoined and restrained from collecting or negotiating all the bonds received by it upon that settlement, and asking for general relief, and the injunction as prayed for was allowed by the judge of the circuit court of Taylor county in chambers. Shortly after this, and before the cause was matured for hearing, the defendants, the Baltimore & Ohio Railroad Company, the Grafton & Greenbrier Railroad Company, and Samuel Spencer, filed their answers to this bill, and at the same time the defendant the Baltimore & Ohio Company filed its petition, with proper affidavit and bond, to remove the cause into this court. And upon its motion this case was docketed on the 11th day of January, 1888. Issue was joined on the 5th day of March upon the answers filed.

Upon this state of the pleadings and proofs in the cause the plaintiffs moved to remand this cause—*First*, because this is not a controversy between citizens of different states, claiming that the Baltimore & Ohio Railroad Company is a domestic corporation, and as such a citizen of the same state in which the plaintiff, as well as the Grafton & Greenbrier Company, the codefendant of the Baltimore & Ohio Company, are citizens; *second*, if the Baltimore & Ohio Company is a citizen of another state, still this is not a separable controversy, which can alone be heard as between the plaintiff and the defendant the Baltimore & Ohio Company, for the reason that the Grafton & Greenbrier Company is a material and necessary party to this suit, as important questions are presented by the pleadings litigating rights existing between the two companies.

The question whether the Baltimore & Ohio Company is a foreign corporation created by the laws of Maryland, and as such a citizen of the state of Maryland, is no longer an open question in this court. It has been repeatedly held by this court that it is a corporation created under the laws of Maryland, and is not a corporation created by any enabling act of Virginia or West Virginia. The court, as now constituted, in June, 1870, held in the case of *Railroad Co.* v. *Supervisors*, not reported, "that the Baltimore & Ohio Company, was a foreign, and not a domestic, corporation, and that the Virginia act of 1827 conferred upon the company a mere license to transact business in this state." This ruling was afterwards followed and adopted by the late Chief Justice CHASE, and by the late Chief Justice WAITE, while sitting on the circuit. For this position the court relies upon the cases of *Railroad Co.* v. *Harris*, 12 Wall. 65, and *Railroad Co.* v. *Koontz*, 104 U. S. 5. In *Railroad Co.* v. *Koontz*, Chief Justice WAITE, speaking for the court, said: "That we held in *Railroad Co.* v. *Harris* that the Baltimore & Ohio Railroad Company was

a Maryland corporation only, and that no new corporation had been created by the enabling act either of Virginia or the District of Columbia." This doctrine is reaffirmed by the supreme court in the case of *Goodlett* v. *Railroad Co.*, 7 Sup. Ct. Rep. 1254, in which Mr. Justice HARLAN, speaking for the court, adopted the language used by the court in *Railroad Co.* v. *Harris*, in which it stated "that the permission given by Virginia to the Baltimore & Ohio Railroad Company was broad and comprehensive in its scope, but it was a license, and nothing more. It was given to the Maryland corporation as such, and that body was the same in all its elements, and in its identity, afterwards as before, in its name, locality, capital stock, the election and power of its officers, in the mode of declaring dividends and doing all its business, its unity was unchanged, only the sphere of its operations was enlarged." We therefore adhere to the opinion heretofore expressed by this court, and again hold that the Baltimore & Ohio Railroad Company is in every sense a foreign corporation, created only by the laws of the state of Maryland; that it had no existence by the laws of Virginia or West Virginia, and, having no existence as such, it can be nothing more nor less than a foreign, and not a domestic, corporation.

As to the second point made by counsel, that this is not a separable controversy, the pleadings and proofs disclose that the main subject of controversy here is in the possession of 1,160 shares of stock, which the Baltimore & Ohio Railroad Company obtained from the Grafton & Greenbrier Railroad Company under the agreement entered into on the 7th day of April, 1887. It is conceded that the possession of this stock was obtained by the Baltimore & Ohio Company under an order passed by the board of directors of the Grafton & Greenbrier Company April 7, 1887. The prayer of the bill in this case is threefold in its object: *First*, to restrain the Baltimore & Ohio Company from anywise using or transferring 1,160 shares of the stock; *second*, if the stock has not been issued by the Grafton & Greenbrier Company to restrain that company from issuing it; *third*, to restrain and enjoin the collection or negotiation of the bonds transferred by the Grafton & Greenbrier Company to the Baltimore & Ohio Company under the order of April 7, 1887. It appears from the pleadings and proofs that the Grafton & Greenbrier Company had issued the stock and transferred the bonds over six months before the institution of this action, and therefore it is unnecessary to take any notice of that prayer of the bill, inasmuch as the relief it seeks under it is based upon an executed contract entered into on April 7, 1887, with which it is conceded the Baltimore & Ohio Company has fully complied, and as a consequence there is no relief to be granted on that prayer of the bill. The answer of the Grafton & Greenbrier Company, upon which the complainants have taken issue, shows that they have no interest in the matter in controversy, and in fact adopts the answer of the Baltimore & Ohio Company as its answer, thus confining the controversy between the plaintiffs in this action and the Baltimore & Ohio Company, its codefendant. It is obvious, therefore, from the prayer of the bill of the complainants in this case, that all the relief the

court can grant is upon the first and third prayer, which seeks to restrain the defendant the Baltimore & Ohio Company, from voting on the stock or negotiating the bonds it had acquired under the order of April 7, 1887. For this reason the Grafton & Greenbrier Company is not a material nor necessary party to this controversy. There is no controversy in fact raised by the pleadings between the codefendants, but the whole controversy, as is disclosed by the pleadings, is between the plaintiffs and the defendant the Baltimore & Ohio Railroad Company. We conclude, therefore, that this is a controversy separable in its nature, and entirely between the plaintiffs and the defendant the Baltimore & Ohio Company.

The plaintiffs assigned as another ground why the court should remand this cause, that it was also removed under the fourth clause of the second section of the act of 1887, on the ground of local influence. Under this act this question is to be determined solely by the circuit court of the United States. The plaintiffs have tendered a plea in writing, which alleges "that it is not true that the Baltimore & Ohio Company has reason to believe, and does believe, that from prejudice and local influence it will not be able to obtain justice in the circuit court of Taylor county, or in any other state court." This plea is manifestly insufficient upon its face. It alleges no fact, but merely a denial of the existence of such belief in the petitioning defendant, the Baltimore & Ohio Company, that it could not get justice on account of prejudice and local influence. The act of congress says "that a removal shall take place when it is made to appear to the circuit court that from prejudice or local influence it will not be able to obtain justice." Clearly this must appear from evidence, and not from belief. If the plaintiffs desire to raise an issue of this character, as to the existence of prejudice or local influence, the plea should affirm that no such local prejudice or influence exists that would prevent the defendant from obtaining justice in the state courts. But it does not so affirm. It makes no issue contemplated by the statute, and for this reason the motion of the defendant the Baltimore & Ohio Company, to strike the plea from the records of this cause, is sustained. It follows, therefore, for the reasons assigned, that the motion to remand this cause to the court from whence it came must be overruled.

The next contention of the plaintiff is that the meeting of the directors of the Grafton & Greenbrier Company on the 7th day of April, 1887, which approved the proposition made by Mr. Spencer, on behalf of the Baltimore & Ohio Company, to the president of the Grafton & Greenbrier Company, was illegal, for the reason that it was a special meeting of the board of directors, and that all of the members of the board of directors had not reasonable notice of the time and place of that meeting, as required by a by-law of the latter company. In the view the court takes of this question, it is unnecessary to decide as to the legality of that meeting. The fact, however, is, as disclosed by the evidence, that the board of directors of the Grafton & Greenbrier Company was composed of 12 directors, and that at that meeting at which they enacted the proposition submitted by Mr. Spencer, on behalf of the Baltimore & Ohio

Company, and by which a contract was made between the two companies, 9 of the 12 members were present, and a majority of the 12 members voted for the adoption of the proposition submitted. If we thought it was necessary to decide this proposition, we would be inclined to the opinion that where a quorum of the directors of a corporation met and united in any determination, the corporation would be bound by it, whether the directors were notified or not; and this doctrine is laid down by the supreme court of New Hampshire in the case of *Edgerly* v. *Emerson*, 23 N. H. 555, 55 Amer. Dec. 207. This ruling, in our judgment, is founded not only in common sense, but in common justice. But, as we have said, we do not rely upon this position, for the reason that it appears that subsequently, on the 27th day of the same month, at another special meeting of the board of directors of the Grafton & Greenbrier Company, all of the members constituting the board of directors had legal notice of the meeting that was called for that day, and that 10 of the 12 members constituting the board were present, and unanimously ratified not only the action of the committee, but also the action of the board of directors at its previous meeting. And again, the evidence discloses that there was a regular meeting of the board of directors of this company on the 15th day of June following, at which time "the minutes of the two last meetings were read and approved." Under such circumstances, can it be questioned for a moment, in the absence of any evidence showing fraud or conspiracy upon the part of the officers or directors of both companies, that such action, taken as it was, was not legal and conclusive as to all the parties to the contract? There is no fraud or conspiracy charged in the bill, and, if there was, there is no proof to sustain it. We are therefore of the opinion that there is nothing in this position.

Another point made by the plaintiffs is, that certain members of the board of directors of the Grafton & Greenbrier Company were personally interested in the action that was taken by the board on the 7th of April, 1887, for the reason that they were guarantors of some indebtedness of the Grafton & Greenbrier Company to some of its creditors other than the Baltimore & Ohio Company. The evidence shows that the Grafton & Greenbrier Company, being hard pressed, and having little or no credit, was compelled to negotiate loans for the further prosecution of its work, and to relieve it from present embarrassment. To secure the loans desired it became necessary for some of the directors to become guarantors of the company for these loans, otherwise it would have been unable to negotiate them. It is not an uncommon thing that the directors of an important improvement are compelled to lend their personal responsibility to a company in order to give it credit and secure means to carry on its operations. Many improvements would languish and die if this action upon the part of the directors was held by the courts of the country to be illegal, and to render them incompetent to act in that capacity. In this case the directors were not primarily liable. The company had already exhausted its credit, and they only became guarantors to the creditors to the extent that money was borrowed upon their per-

sonal responsibility. And in the language of the supreme court of New York in the case of *Duncomb* v. *Railroad Co.*, 88 N. Y. 9: "They were under no personal obligation originally, in contracting the debt, and no reason is shown why they were not justified in placing the company in a position to pay its indebtedness and to relieve it from its embarrassment." Certainly there can be nothing wrong in a director securing a demand of this character against his company, but it does not appear that these directors did anything that other directors who had no interest except the welfare of the company at stake, did not unite with them in. The money that was raised under the contract of April 7, 1887, was altogether expended in discharge of liabilities and debts of this company, in which, so far as the evidence discloses, not a single director was primarily liable, nor did any director receive any personal benefit, so far as we can perceive, from the contract that was then entered into. Upon this point the law is clearly stated by Mor. Priv. Corp. § 527. He says: "To prohibit the directors in all cases from dealing with the corporation, would often deprive the latter, in time of need, of the assistance of those persons who have the greatest interest in its welfare, and who are willing to give their aid upon the most reasonable terms." For these reasons, we are of the opinion that no improper action was taken by the board of directors at the time that the contract was entered into, and that the transaction was of an unexceptionable character.

In this connection it was suggested that under the Code of West Virginia the Baltimore & Ohio Railroad Company, being a corporation, could not subscribe for or purchase the stocks, bonds, or securities of any other corporation; that all they could do would be to take it in payment, or in lieu, or in part of, any debt *bona fide* owing to it. The simple answer to this position is that the history of this case shows that the Baltimore & Ohio Railroad Company neither purchased stocks nor bonds. That it lent its aid in the way of advances in money, material, and other property, cannot be denied; and that that aid was furnished in good faith, for the reason that the Baltimore & Ohio Company regarded the construction of this work as an important feeder to its main line. That before it received any stock or bonds it had made advances in various ways, amounting to about $90,000, holding as security, only, for these advances, $120,000 of the first mortgage bonds of the Grafton & Greenbrier Company as collateral. The Grafton & Greenbrier Company, finding that it was unable to redeem these bonds, and having defaulted in the payment of the interest, and desiring to extend its road 17 miles further, applied, through its officers, to the Baltimore & Ohio Company for further aid. The Baltimore & Ohio Company, after various interviews between the officers of the two companies, made a proposition in writing, by which it agreed to surrender the $120,000 of the first mortgage bonds for $120,000 of the first consolidated mortgage bonds, in lieu of those that it held. It agreed also to make, and also stipulated that it would make, further advances, provided it was secured by the bonds and the stock of the Grafton & Greenbrier Company for these advances. The Baltimore & Ohio Company did not go out in the open market and pur-

chase either bonds or stock. All that it did was to make advances to aid this enterprise in its struggle to construct its road, and to relieve it from embarrassment. Such action we cannot hold to be in derogation of the statute, but simply an offer upon the part of the Baltimore & Ohio Company to aid a company organized under the laws of West Virginia, and which, but for its aid, would have been unable to prosecute its work to completion. The circumstances surrounding this transaction, and the proofs, clearly show that this was the only object and purpose of the Baltimore & Ohio Company. It did not, of itself, propose to the Grafton & Greenbrier Company to purchase their road, to purchase their bonds, or to purchase their stock. Its action was only taken after repeated applications made by the officers of the Grafton & Greenbrier Company for aid to relieve the latter from its financial embarrassment. It is not denied that the Baltimore & Ohio Company have in good faith performed their portion of the contract, and that the Grafton & Greenbrier Company has had the full benefit of that performance. To cancel and annul the contract entered into April 7, 1887, by which the Baltimore & Ohio Company became the owner of the bonds and stocks of the Grafton & Greenbrier Company, would be manifest injustice, and accomplish a legal wrong. It would allow the plaintiffs to set aside a contract to which they are not parties, and as a result avail themselves of a defense not personal to them, and which the Grafton & Greenbrier Company could not and would not be permitted to raise. The Grafton & Greenbrier Company has received from the Baltimore & Ohio Company nearly $200,000 in money and property as the fruits of the contract. It has spent the money, and appropriated the property acquired thereby, and if the court was to cancel the contract, no order that it could make would restore the *status* of the two corporations. It is a well-settled principle "that a corporation cannot avail itself of the defense of *ultra vires* when the contract has been in good faith fully performed by the party, and the corporation has had the full benefit of the performance of the contract." *Arms Co.* v. *Barlow*, 63 N. Y. 70. Applying this principle to this case, if the Grafton & Greenbrier Company is unable to avail itself of this defense, certainly the plaintiffs are not entitled to it.

For the reasons assigned, we are of the opinion that the injunction heretofore awarded in this cause must be dissolved, but this case is retained for any further action that either party may desire to take upon merits.