Staunton.

BOARD OF SUPERVISORS OF TAZEWELL COUNTY V. NORFOLK AND WESTERN RAILWAY COMPANY.

September 11, 1916.

1. HIGHWAYS—*Tazewell County—Statutes—Width of Roads.*—The several acts of Assembly, relating to the construction of certain public roads in Tazewell county, referred to in the opinion of the court, did not of themselves establish or locate the turnpike or public roads contemplated thereby, nor did they fix the width of such roads. They directed them to be constructed as State roads, and the act of March 2, 1847, merely controlled the wide discretion of the board of public works when it came to take land for the location and construction of the road.

2. EVIDENCE—*Records—Loss or Destruction—Presumption.*—The existence of facts will not be presumed merely because records have been lost or destroyed. Such loss or destruction gives rise to no presumption and has the effect merely of changing the mode of proof of such records, admitting secondary evidence in the place of an exemplification of the record.

3. HIGHWAYS—*Acceptance—Dedication.*—Where the record shows that a road was not the result of condemnation proceedings, acts of acceptance do not supply its place so as to give title to a right of way. Acceptance is merely one element in obtaining title to a right of way for a public road. Dedication is the accompanying element.

4. HIGHWAYS—*Prescription—Width and Extent of Use.*—When dedication of a highway is implied from continuous use by the public for the statutory period, and there has been acceptance by competent authority, title to a right of way may be acquired by prescription. But the right cannot extend beyond the use. If the right to the way depends solely upon the use, then the width of the way and the extent of the servitude is measured by the character of the use, for the easement cannot be broader than the use.

5. RAILROADS—*Change of County Road—Consent—New Road.*—At the time the county road in controversy was changed by the railroad company, the company was not required to obtain the consent or approval of the county court to such alteration, but could act *ex parte.* The only limitation upon this right of the railroad company

as the law then stood, was the requirement of the statute that it should make an equally convenient road in lieu thereof.

6. EVIDENCE—*Railroads—Change of County Road—New Road.*—Where a railroad company, acting *ex parte,* has made a new road in the place of a former county road, and it is claimed by the county that the new road is not "an equally convenient road," the burden is upon the railroad company to show that it is.

7. RAILROADS—*Grade Crossing—How Constructed—Width—Grades.*—The true meaning of the statute requiring railroads to construct their grade crossings of public highways with easy grade so as to admit of safe and speedy travel over them, is that the company may construct its road across the public highway, but must do so with as little injury to the highway as is practically possible. It must so restore the highway that its use by the public will not be materially, or at least unnecessarily, interferred with, and so as not to render it less safe and convenient for the passage or transportation of persons or property along the same, except so far as diminished safety and ·convenience are inseparable from its use by the railroad. The approaches on both sides of the crossing should be of the same width as the old public highway, and the grades as easy as can be obtained under the circumstances.

8. JUDGMENTS—*Res Judicata—Estoppel—Acquittal of Crime—Civil Suit.*— A judgment of acquittal of a railroad company on a charge of obstructing a highway at a grade crossing by placing its track thereover, is no bar to a suit by the county against the railroad company to compel it to comply with the statutory requirement as to the character of the road it should build at said crossing. The parties are not the same, the proceedings are of a different nature, and the degree of proof required in the two cases is not the same.

9. EQUITY JURISDICTION—*Legal Duty—Contractual Relations.*—A railroad company having assumed the duty imposed by statute to build "an equally convenient road" in lieu of a road occupied by it, a court of equity will compel the performance of that duty, although no contractual relations existed between the parties.

10. HIGHWAYS—*Public Rights—Statute of Limitations—Laches.*—Public highways belong to the State, and the statute of limitations does not run against the rights of the public therein, nor does the doctrine of laches apply. As against the government, laches cannot be set up as a defense in equity any more than the bar of the statute can at law. Time does not run against the State, nor bar the rights of the public.

Appeal from a decree of the Circuit Court of Tazewell county. Decree for the defendant. Complainant appeals.

*Reversed in part.*

The opinion states the case.

*H. Claude Pobst, J. W. Harman* and *J. N. Harman,* for the appellant.

*Graham & Hawthorne,* for the appellee.

Sims, J., delivered the opinion of the court.

This is a suit in equity, on appeal from the Circuit Court of Tazewell county, involving change by the defendant in the court below, appellee here, the Norfolk and ·Western Railway Company (the change in fact being made by the Norfolk and Western *Railroad* Company, a former corporation, to the rights and duties of which the *railway* company succeeded, and hence its liability is the same in this civil suit as if it had been the original actor in the case and it may be treated as if it were such original actor) of the location of a public road between Doran and Raven, or of portions of it, and a crossing of such public road at Raven by such railway company, the bill alleging that the defendant failed to comply with its statutory duty and obligations in these matters, and is guilty of maintaining a public nuisance; the prayer of the bill being that the defendant be compelled to comply with its duty and obligations or else restore to Tazewell county the old road, and that it be enjoined and restrained from further use and occupation of said public road, to thereby abate such nuisance, and for general relief.

The cause was heard upon the bill, exhibits therewith, the answer of the defendant, depositions in behalf of the plaintiffs and defendant, together with a number of photographs and several blue prints, and the court below, by its decree of September 9, 1915, dismissed the plaintiff's bill.

On February 16, 1916, the plaintiffs moved the court below for leave to file a bill of review, setting forth and exhibiting with such bill what was claimed to be after-discovered evidence, consisting of certain orders of the County Court of Tazewell county entered in 1857 and 1858, some of which in effect evidenced that the county authorities took charge of and undertook to keep in repair the said road from Doran to Raven, which the plaintiffs claim was a part of the second link of the Richlands and Kentucky turnpike, presently more particularly referred to. There were also filed with the bill of review certain other orders of the said county court, entered during the years 1850, 1851 and 1852 in reference to certain persons appearing before said court and making suggestions and claims for damages done to their lands by the construction of the road connecting the Richlands and Kentucky line road with the Tazewell court house and Fancy Gap turnpike, some of such orders showing allowance of such damages by the court and certifying same for payment.

The court below, by its decree entered February 22, 1916, refused to permit such bill to be filed and dismissed said motion of the board of supervisors to be allowed to file the same.

From these two decrees the appellants have appealed.

Upon the issues made in the cause and evidence in the court below arise the following points for the consideration of this court on appeal, namely:

1. What was the width of the public road between Doran and Raven at the time the railway company made changes in its location?

2. What was the authority given by statute to the railway company to make such change of location as

it made of the road between Doran and Raven, and with respect to the crossing at Raven.

3. Whether the railway company at the time of such change of location made an equally convenient road as the old road taken by it—including width of right of way, location, drainage, grade, etc., etc.

4. Whether the railway company complied with its statutory duty as to the crossing at Raven.

5. Whether a verdict in favor of the same defendant in a prior criminal case of the Commonwealth against it for unlawfully obstructing the same road estops the board of supervisors from prosecuting this suit.

6. Whether lack of contractual relations and lapse of time and laches bar the plaintiffs in this suit for specific performance.

We will consider these points in the order stated.

1. As to what was the width of the public road between Doran and Raven at the time the railway company made changes in its location.

The board of supervisors rely on act of March 5, 1847 (Acts 1846-7, p. 89); act of January 17, 1848 (Acts 1847-8, p. 178) act of March 7, 1849 (Acts 1848-9, p. 96); act of March 2, 1853 (Acts 1852-3, p. 72), which in effect directed the construction and completion of the *first* link in a turnpike beginning at "the Richlands" and extending in a northwesterly direction to the Kentucky line; and on act of January 30, 1850 (Acts 1849-50, p. 63), and act of February 16, 1853 (Acts 1852-3, p. 77), which, in effect, directed the construction and completion of the *second* link in said turnpike, beginning at "the Richlands" and extending in an easterly direction to Tazewell court house and there connecting with the Fancy Gap road.

The board of supervisors claim that "Raven" is the same place as "the Richlands," and that the road from Doran to Raven, as located when the railway company made the changes of location of which complaint is made, was a part of the *second* link in the turnpike aforesaid mentioned in said act of Assembly of Virginia, namely, was that part of it beginning at "the Richlands" and extending in an easterly direction towards Tazewell court house. The railway company denies this, claiming that the Richlands and Kentucky turnpike referred to in said act of March 8, 1847, was built and its terminus in "the Richlands" was located at the mouth or near the mouth of Coal creek, and "ran from there northwestward across the dividing ridge—that is, the mountain which divides the waters of Clinch river, or Tennessee waters, from the Louisa Fork river, or the waters of the Ohio river. That the terminus of this road in Richlands lies west of the terminus of the road in controversy."

In the view this court takes of the effect of the acts above referred to, it is unnecessary to inquire which contention is correct. We are of opinion that the acts in question did not of themselves establish or locate the turnpike or public roads contemplated thereby, nor did they fix the width of such roads. These acts directed these roads or links in the same road to be constructed as a State road. As the law then stood—

"1. When any act shall pass, directing any work of internal improvement to be made on State account, the board of public works shall cause the same to be constructed . . . as may seem to them proper.

. . . .

"2. The board may exercise the same powers and in like manner that a company incorporated for a work of internal improvement may exercise under the

fourth, fifth . . . sections of the fifty-sixth chapter . . . " Code, 1840, secs. 1 and 2, pp. 348-9.

The act of March 8, 1847, provided that the road therein directed to be constructed, "shall nowhere exceed a grade of four degrees, nor shall be more than twenty-two feet wide, nor less than twelve feet wide, exclusive of side ditches;" but the effect of this was not to fix or establish these widths, or any of them, as the width of the road, or right of way for the road, but merely controlled the wide discretion of the board of public works under sections 1 and 2, Code, 1849, *supra,* when it came to take the land for the location of and to construct the road.

Preliminary to the work of construction, the right of way must be acquired. As the law then stood the following was the mode provided by statute by which the right of way was to be acquired, the road located and its width fixed:

"Of the land to be taken for such work, the board shall cause a plat to be returned to the clerk's office of the court of each county wherein any of the land lies and there admitted to record, and the said land shall *ipso facto* be vested in the State." Code, 1849, sec. 5, ch. 70, p. 349.

There were provisions of law that after the plat was so recorded the land owners whose land was taken might, within a prescribed time, claim damages by petition to the county or circuit court.

It appears in this case that a search of the records of Tazewell county fails to show the existence at any time of any such plat admitted to record in such county covering the road in controversy, or any part of it; and there is no proof in this case of the loss or destruction of any such record so as to admit secondary proof

of its one time existence, and there is no evidence tendered attempting to introduce such proof.

The court will not presume the existence of facts merely because records have been lost or destroyed. Such loss or destruction gives rise to no presumption and has the effect merely of changing the mode of proof of such records, admitting secondary evidence in the place of an exemplification of the record. *Gaines* v. *Merryman*, 95 Va. p. 665.

We are clearly of opinion, therefore, that there is no evidence in this cause that any title was vested in the State, or that it acquired the right of way of any width to construct the road in controversy by any statutory proceedings.

Similarly as to the county of Tazewell. There existed at the time this road is claimed to have been established as a public road certain provisions of statute contained in ch. 52 of the Code of 1849 for the establishment of public roads by proceedings in the county court by which the right of way therefor could be condemned. It is not claimed by the plaintiffs that any such proceedings were taken with respect to the road in controversy or any part of it.

It is insisted, however, on the part of the plaintiffs that, as the exhibits with the bill of review sought to be filed show the road in question was in 1858 a public road, it must have been established under and in pursuance of the acts of the legislature relied on. This appears to us to be a *non sequitur*. Under the well settled rule in Virginia, the acts of the county authorities shown by such exhibits evidence an acceptance of the road as a public road. They do not establish it as such.

As was said by Keith, P., in *Gaines* v. *Merryman*, 95 Va. on page 664, 29 S. E. 738: "There is evidence that

the county of Henrico was divided by the county court into road districts, and there is evidence that that order, as applied to the district in which this road is situated must have had reference to this road, or been wholly without any subject upon which it could operate, but that is wholly insufficient to create a public road. If instead of such an indirect recognition of it as a public road as could be inferred from this order, the county court had in express terms declared the road in controversy to be a public road, it would not of itself have made it a public road . . "

The statute relied on by plaintiffs—sec. 944-e (2), Pollard's Code, 1904; sec. 22, ch. 52, Code, 1873; sec. 5, ch. 52, Code, 1860; sec. 5, ch. 52, p. 267, Code, 1849; sec. 7, ch. 256, p. 235 Code, 1819—and what is said in *Terry* v. *McClung,* 104 Va. at p. 302, 52 S. E. 355, in regard to the thirty feet in width requirement as to all public roads, cannot be construed to give those statutes themselves the effect of establishing public roads or any public road thirty feet in width.

As said by Keith, P., in *Gaines* v. *Merryman, supra,* 95 Va. 665, 29 S. E. 738, referring to Acts of the General Assembly passed in the fourth year of the reign of Queen Anne and October 31, 1751: "The first declares that 'where the same is not already done, public roads shall be laid out by the surveyors of the highways in their several precincts in such places as shall be most convenient for passing to and from the city of Williamsburg, the court house of every county, the parish churches and such public mills and ferries as now are or hereafter shall be erected, and from one county to another; and that the highways already laid out, together with such as shall hereafter be laid out by virtue of this act, shall at all times hereafter be kept well cleared from woods and bushes and the roots

well grubbed at least thirty feet broad.' The act of 1751 is almost identical with that quoted. It does not establish public roads and such was not its purpose.

. . . .

"It would be a dangerous decision for it to declare, as we are urged to do by the appellees, that the effect of these statutes was to establish as public highways all roads that can be shown to have been in use on the date of their passage . . "

Similarly, we are of opinion that the acts relied on by counsel for appellant do not establish the road in question as a public road.

The record in the case at bar showing that the road in controversy was not the result of condemnation, acceptance does not supply its place so as to give title to a right of way. Acceptance is merely one element in obtaining title to a right of way for a public road. Dedication is the accompanying element.

As said by Riely, J., in *Buntin* v. *Danville,* 93 Va. on p. 204, 24 S. E. 830: " 'The principle of dedication by act of the owner of land,' said Judge Staples in *Harris' Case,* 20 Gratt. 833, 'is now almost universally recognized as a part of the common law of the land.' Dedication is an appropriation of land by its owner for the public use. It may be express or implied. It may be implied from long use by the public of the land claimed to be dedicated. Dedication is not required to be made by a deed or other writing, but may be effectually done by verbal declarations. The intent is its vital principle and dedication may be made in every conceivable way that such intention may be manifested. It must, however, be manifested by some unequivocal act, and is not effectual and binding until accepted. When the intention of the owner to make the dedication has been unequivocally manifested, and

there has been acceptance by competent authority, or such long use by the public as to render its reclamation unjust and improper, the dedication is complete." Citing *City of Richmond* v. *A. Y. Stokes & Co.*, 31 Gratt. (72 Va.) 713; *Talbott* v. *R. & D. R. R. Co.*, 31 Gratt. (72 Va.) 685; *Harris' Case, supra; Kelly's Case,* 8 Gratt. (49 Va.) 632; *Ball* v. *McLeod,* 2 Met. (Ky.) 98, 74 Am. Dec. 400; *Harding* v. *Jasper,* 14 Cal. 642; *Morgan* v. *Railroad Co.*, 96 U. S. 716, 24 L. Ed. 743; *Devaston* v. *Payne,* 2 Smith's Lead. Cas. 213; *State* v. *Trask,* 6 Vt. 355, 27 Am. Dec. 554, and note thereto; 2 Greenleaf on Ev., sec. 662; and Wash. on Easements, 180 and 182.

When the *dedication* is implied from the long and continuous use by the public for the prescriptive period of twenty years, and there has been acceptance by competent authory title to a right of way for a public road may be obtained by prescription. *Com'th* v. *Kelly,* 8 Gratt. (49 Va.) 632.

Such is the case at bar, as shown by the proof, and as indeed is admitted by counsel for defendant in their brief.

What then was the width of the right of way of the road in controversy acquired by prescription by such user before the removal of any part of it by the railway company?

In *Columbia* v. *Robinson,* 180 U. S. 92, 21 Sup. Ct. 283, 45 L. Ed. 440, the Supreme Court said: "Relying for right of way on use, the right could not extend beyond the use. Or, as it has been expressed, 'if the right to the way depends solely upon user, then the width of the way and the extent of the servitude is measured by the character of the user, for the easement cannot be broader than the user.' "

To the same effect are the following authorities: *Board of Sup. Prince William Co.* v. *Manuel,* 118 Va.

716, 88 S. E. 54; *Arndt* v. *Thomas*, 93 Minn. 1, 100 N. W. 578, 106 Am. St. Rep. 418, 2 Ann. Cas. 972; *Scheimer* v. *Price*, 65 Mich. 638, 32 N. W. 875; *Anderson* v. *Huntington*, 40 Ind. App. 130, 81 N. E. 223; *Davis* v. *Bonaparte*, 137 Iowa 196, 114 N. W. 996.

Counsel for the board of supervisors contend that even though this court should "not presume that the proceedings in opening this road and in pursuance of said acts of the legislature were regular, and hold that the right acquired was only a prescriptive right, nevertheless the authorities are to the effect that the width of the road would not be limited to the actual user, but would extend the entire width of the highway that was attempted and intended to be established, to-wit, the highway described in said acts." The only authority cited to sustain this position is 37 Cyc. p. 41, as follows:

"(II) *Effect of Defective Proceedings to Establish Highway.*—Another qualification of the general statement that the width of a prescriptive highway is measured by the actual user exists where a highway is acquired by prescription under color of defective proceedings to establish the same. In this event the width of the highway is ordinarily the width of the highway so attempted and intended to be established, although the user does not extend over that entire width."

There is no evidence in the case at bar of any proceedings to locate or establish the right of way for the road under the statutes relied on, or any other proceedings; so it is not a case of "defective proceedings," referred to in the authority cited, which might have had the effect of color of title and give constructive possession to the extent of the bounds of such color of title. We do not consider, therefore, that the author-

ity last quoted is in conflict with the well established rule on the subject.

Our conclusion, therefore, is that the width of the public road in question at the time the railway company made changes in its location was confined to and was the width of such road as was in use by the public at that time, including the side ditches and slopes, in addition to the roadbed or traveled portion of the roadway—which, it appears from the evidence, was the same as it had existed for the prescriptive period.

2. What was the authority given by statute to the railway company—

*a.* . To make such changes of location as it made of the road between Doran and Raven; and

*b.* With respect to the crossing at Raven.

The defendant made the alterations in the location of the road in controversy it did make, and the crossing by the railroad of the public road at Raven in 1888 and 1889.

*a.* The statute law in force in Virginia at that time with respect to such change in location of a public road is contained in Acts 1874-5, p. 47—subsequently, in substance, in section 1094 of the Code of 1887, and in so far as same affects public roads is as follows: " . . But any county road . . . . may be altered by any such company, for the purpose aforesaid, whenever it shall have made an equally convenient roadway in lieu thereof."

*b.* The statute law then in force with respect to crossings of a public road by a railroad is substantially contained in the same Acts of 1874-5, p. 47, and in section 1094 of Code, 1887, and substantially in Acts of 1883-4, p. 528, section 1 and in section 1095 Code of 1887, as follows: "If any railroad . . . deem it necessary in the construction of its works to cross

any . . . county road, it may do so; provided
such crossing does not impair the safety, or impede or
endanger the operations of the road . . '' Code,
1887, section 1094.

"Every railroad hereafter constructed across a county
road . . shall, so far as practicable, pass at surface
grade, or pass beneath or above any existing structure,
at a sufficient depression or elevation, as the case may
be, with easy grades, so as to admit of safe and speedy
travel over each.'' Code, 1887, section 1095.

*a.* Now in regard to said alteration of the location
of the road in controversy.

Counsel for the plaintiff contend that the defendant
had no authority to act *ex parte* under said statute,
ignoring the courts and road authorities, and cite
chapter 43 of Code, 1887, as vesting in the county
courts exclusive jurisdiction of county roads, *Watts* v.
*So. Bell Tel., &c. Co.*, 100 Va. 45, 40 S. E. 107, as so
holding, and *Norfolk & Western Ry. Co.* v. *Supervisors
of Carroll Co.*, 110 Va. 95, 65 S. E. 531, as a case in
which the Norfolk and Western Railway Company
filed its petition in the County Court of Carroll county
asking leave to make such alterations.

In this connection the following should be borne in
mind: The same statute above cited contained in
Acts 1874-5, p. 47, which provides that "any county
road . . may be so altered whenever such com-
pany shall have made an equally convenient road,"
does not allow a railroad to alter the location of a State
road by *ex parte* action, but requires the agreement
of the board of public works upon the terms and man-
ner of the alteration. Similarly the same statute in
section 1094 of Code, 1887, contains practically the
same prohibition of *ex parte* action of a railroad com-
pany by requiring, in case of alteration of the location

of a "turnpike" the agreement of the company . . or *court,* owning or *having charge* of the work to be affected by the change. That is to say this statute, as it stood in 1888, did not allow a railroad company in case of alteration of a State road (until May 1, 1888, when the Code went into effect) or a *turnpike* (after May 1, 1888) to act *ex parte* and ignore the road authorities, but placed no such limitation upon such action in case of a *county road.* It was not until the re-enactment of said section 1094 as section 3 of Acts of 1902-3-4, p. 968 (Pollard's Code, 1904, p. 655) that such limitation was imposed as to county roads, such act then providing: "But any county road . . may be altered by any such company, for the purpose aforesaid, whenever it shall have made an equally convenient road . . in lieu thereof; *the said company having first obtained the consent of the board of supervisors of the county to the alteration of any road or highway,*" the words in italics being then first added to the statute.

The question under consideration was not involved in the cases of *Watts* v. *So. Bell Tel., &c. Co., supra,* and *N. & W. Ry. Co.* v. *Supervisors of Carroll Co., supra.* The former was a personal injury case, and in the latter case the railroad company went voluntarily into court and it did not involve the consideration by the court of the power given by said statute (Acts 1874-5, p. 47, or section 1094, Code of 1887) to a railroad company to act *ex parte* in the matter of altering a county road thereunder.

As to chapter 43 of Code of 1887: Sections 945 and 947 provide for action by the county courts on their own motion and upon application of others for alteration of location of roads, etc.

The language of section 947, ch. 43, Code, 1887, is: "When any person applies to the court," etc., "and whenever without such application it sees cause for so doing," etc., contemplating only action by such courts without application of any one or on voluntary application. There is nothing in the chapter showing any legislative intention to forbid any action by railway companies under section 1094 contained in the same Code, except upon condition that they should make prior. application to the court.

We are therefore of opinion that, as the statute law stood when the alteration in location of the road in controversy was made, such road being then a county road, the railway company was not required to obtain the consent or approval of the county court to such alteration, and that the only limitation upon this right of the railway company, as the law then stood, was the requirement of the statute that it should make "an equally convenient road . . in lieu thereof." Whether this was done in the case at bar is a question of fact which we think was properly before the court below for determination.

We will therefore now consider the question of fact:

3. Whether the railway company, at the time of such change of location, made an equally convenient road as the old road taken by it—including width of right of way, location, drainage, grade, etc., etc.

In this connection if should be noted that counsel for plaintiff, in their brief, contend that in considering the question of fact as to whether the railway company has performed its statutory duty "to make an equally convenient road," that duty must be regarded as a continuing one, and cite. the case of *City of Charlottesville* v. *Southern Railway Co.*, 97 Va. 428, 34 S. E. 98,

in support of that position. That was the case of a railway crossing a public road, and the bridge and approaching embankments of the railway company were narrower than the original width of the street "as established by law before such encroachment."

If in the case at bar it should appear that the railway company did not make an equally broad roadway, where it altered the road in controversy, as the right of way existing at the time of such alteration, acquired by prescription as above referred to, but a roadway narrower than such right of way belonging to the State or county at such time, the duty to make such equally broad roadway is a continuing one and such duty is not performed until such equally broad roadway has been made. To that extent the case cited is an authority applicable and binding in the case at bar. In the case at bar, however, this principle resolves itself into the inquiry of fact, whether the roadway which the railway company provided in lieu of the public road taken was at any place less convenient, that is to say narrower than the right of way of the old road acquired by prescription, as aforesaid, or was not of as good location, drainage, grade, etc., etc.

On this question of fact the effect of the decree of the court below was to hold that the new road provided by the railway company was "equally convenient" as the old road, *i. e.*, was no narrower in width of right of way, was of as good location, drainage, grade, etc., etc.

In this connection will be considered also the position of the plaintiff, that the defendant having acted *ex parte* under the statute, the burden of proof is upon it to show that it has performed its duty under that statute. We consider this position well taken and that such burden does rest upon the defendant.

So considering, we find that the evidence in the record is voluminous and to some extent conflicting upon this question of fact. But the preponderance of evidence is, in our opinion, very greatly in favor of the holding of the court below, so far as those portions of the old road are concerned the location of which was altered. Such being our conclusion on this point, we do not feel that any good purpose would be served by prolonging this opinion with a discussion of the testimony introduced *pro* and *con* on this question of fact. It is sufficient to say that affirmative testimony was introduced by the defendant which was sufficiently definite and convincing in its character to sustain the burden of proof resting upon the defendant.

With respect to the crossing at Raven, however, our conclusion is different. Upon the inquiry:

4. Whether the railway company complied with its statutory duty as to the crossing at Raven? We find no evidence in the record introduced by the defendant.

The only controverted question as to this crossing in the record is as to whether complaint of it is made in the bill. In exceptions entered in the taking of the depositions, counsel for the railway company take the position that no such complaint is made in the bill, and that the Richlands and Kentucky line turnpike began right at or about this crossing and included the crossing, so that such crossing is not on or a part of the public road as to which complaint is made in the bill. The bill however alleges Raven "post office" as the terminus at Raven of the road from Doran to Raven, about the interference with which by the railway company complaint is made.

In the answer of the defendant railway company, after describing what it alleges were the changes made

in location of the public road "beginning at the point called Doran post office," for 4,300 feet along such road towards Raven, it alleges that from the end of such 4,300 feet "the present road is on the exact old location from there to what they term the Raven post office, at or or about Coal creek, the terminus of the road in question."

Hence, by both bill and answer the fact is put in issue, whether the defendant railway company has performed its statutory duties with respect to said original road all the way from Doran to Raven *post office.*

The uncontradicted evidence in the case is that the crossing in question is on or a part of the public road between Doran and Raven *post office,* being some 150 feet east of Raven post office on such roadway. Whether the railway company complied with its statutory duty with respect to this crossing was therefore clearly put in issue by the bill and answer in this case.

The uncontradicted evidence of the plaintiff on this issue of fact is that the original roadway at the crossing in question was practically on a level. Counsel for plaintiff in their petition expressly rely upon this issue. Counsel for the defendant in their brief make no mention of this issue and do not insist upon their objection noted in the taking of the depositions above referred to, nor does it appear that such objection was called to the attention of or passed upon by the court below. Counsel for plaintiff in their reply brief again insist and rely upon this issue.

The evidence of the plaintiff on this issue of fact is that the original roadway in controversy at the crossing in question was practically on a level, as above stated, before the construction of the railroad; that the railway company made a fill across this roadway where it crossed it west of Coal creek, the fill being, according

to some of plaintiff's witnesses who made no measurements but approximated in his statements, five or six feet in height, causing a grade in the road, as the railway company constructed and left it, of possibly fifteen *per cent.* for a distance of about ten feet on each side of the railroad. The testimony of another witness for plaintiff, as to such fill and grade of the road caused thereby, who made actual measurements, was that the grade of the road on the south side of the crossing is twenty-five *per cent.* for the first twenty-five feet; that measuring from the center of the track for eight feet, the road is the same elevation as the track; that twenty-five feet from the center of the track it is four and one-half feet lower than the top of the rail of the track; that seventy-five feet distant it is seven and one-half feet lower; that one hundred feet distant it is eight and one-half feet lower; and that on the north side of the track the grade of the road is fifteen *per cent.* for the first thirty feet from the center of the track, being four and one-half feet lower; that at fifty feet the road is three and one-half feet lower, and that at seventy feet it is seven and one-half feet lower than the top of the rail of the railroad track.

Section 1095 of the Code of 1887, enacted March 13, 1884, (Acts 1883-4, p. 528) is above quoted; also the provisions of Acts 1874-5, p. 47, as to railway crossings of public roads.

The rule laid down in *Charlottesville* v. *Southern Ry. Co., supra,* as to the construction of the last named statute on this subject is as follows: "To construe the statute literally would defeat the very object which the legislature had in view in passing it, for in the very nature of things it is impossible to construct a railroad across a highway without to some extent impairing its safety or impeding or endangering the passage or

transportation of persons or property. The statute must, therefore, receive a reasonable construction, such a one as would enable the railroad company to exercise the power conferred; but it must at the same time be so construed as not to deprive the public of their right in the highway to any greater extent than is necessarily implied from the power granted. The true meaning of the statute is, we think, that a railroad may construct its road across a public highway, but it must do so with as little injury to the highway as is practically possible. It must so restore the highway that its use by the public will not be materially, or at least unneccessarily, interfered with, and so as not to render it less safe and convenient for the passage or transportation of persons or property along the same, except so far as diminished safety and convenience are inseparable from its use by the railroad." Citing 2 Wood's Railway Law, 877-8; 3 Elliott on Railroads, sec. 1105; Pierce on Railroads, 245; 2 Shearman & Redfield on Neg., sec. 415; *State* v. *St. Paul, &c. Ry. Co..* 35 Minn. 131, 28 N. W. 3, 59 Am. Rep. 315; *Railroad* v. *Coms.,* 31 Ohio 339; *Roberts* v. *C. & N. Railroad,* 35 Wis. 679; *Jones* v. *Erie, &c. R.* 169 Pa. 333, 32 Atl. 535, 47 Am. St. Rep. 916; *Evansville, &c., R. Co.* v. *Carvener,* 113 Ind. 51, 14 N. E. 738, 32 Am. & Eng. R. R. Cases 134.

The statute enacted in 1884, above quoted, expressly provides that such railroad crossing of a public road thereafter constructed "shall as far as practicable pass at surface grade or pass . . above any. existing structure, at a sufficient . . elevation, ·. . with easy grades so as to admit of safe and speedy travel over each."

We are of opinion that it was the statutory duty of the defendant railway company to construct the pub-

lic road in its approaches on both sides of said crossing of the same width as the old public roadway in use by the public in 1888 or 1889 when the railway company constructed said crossing, and of as easy grade as can be obtained by grading such road from Coal creek to the top of the railway at such crossing as the latter is approached from the direction of Doran, and of as easy grade as can be obtained from the top of such railway crossing at such public road to Raven post office; that the defendant railway company has not complied with such statutory duty; and that the decree of the court below was erroneous in not so holding.

It is claimed by counsel for the defendant company, however, that no relief can be granted the plaintiffs because of. the two remaining positions on which it relies, which we will now consider.

5.   Whether a verdict in favor of the same defendant in a prior criminal case of the Commonwealth against it for unlawfully obstructing the same road estops the board of supervisors of Tazewell county from prosecuting this suit?

The facts bearing on this question may be briefly summarized as follows: Upon complaint and information under oath of one Jackson Shelton, a warrant was issued by a justice of the peace of Tazewell county against the Norfolk and Western Railway Company, charging that the latter had *unlawfully* obstructed the public road leading from Doran post office to Raven post office by unlawfully keeping and maintaining railroad. ties, steel rails and railroad tracks, fences, cuts and fills, and by unlawfully throwing and dumping dirt and stone on said public road; and there was another count in such warrant charging the same things as done *knowingly, wilfully* and without lawful authority.   On the calling of this case before said justice of

the peace, the Norfolk and Western Railway Company, by counsel, and the attorney for the Commonwealth appeared, the latter introduced evidence, the former declined to introduce any evidence, and the justice entered an order finding the defendant "guilty of the offense charged in the warrant," and fined it five dollars and costs, and the following thereafter appears in such order: " . . and it being suggested by the attorneys for both parties that it is desired to make a test case out of this, the defendant therefore prayed that an appeal from said judgment to the Circuit Court of Tazewell county may be allowed, which appeal is allowed," etc. Thereafter this case was docketed in said circuit court, prosecuted by the attorney for the Commonwealth, resulting in a verdict of a jury of not guilty on December 18, 1913, which was all prior to the institution of the suit at bar.

Counsel for the defendant plead the said acquittal as in bar of this civil suit. On this question counsel for the plaintiff take the position that not only are the parties different, but that the issues are widely different, as well as the burden of proof, and they rely upon the following authorities:

In the case of *Stone* v. *United States*, 167 U. S. 178, 17 Sup. Ct. 778, 42 L. Ed. 127, Stone was sued for the value of certain timber cut and removed by him from public lands. Stone had previously been indicted by the United States for unlawfully cutting and removing this same timber, in which he was acquitted by the jury, and he set up as a bar to the civil suit his previous acquittal in the criminal case, which involved the same question, and was between the same parties, but the court held that an acquittal of the defendant under the indictment was not a defense to an action against him by the United States for the conversion of the timber.

The court in its opinion at page 188 of 167 U. S., at page 782 of 17 Sup. Ct. (42 L. Ed. 127), states as follows: "In the present case the action against Stone is purely civil. It depends entirely upon the ownership of certain personal property. The rule established in *Coffey's Case* can have no application in a civil case not involving any question of criminal intent or of forfeiture for prohibited acts, but turning wholly upon an issue as to the ownership of property. In the criminal case the government sought to punish a criminal offense, while in the civil case it only seeks in its capacity as owner of property illegally converted, to recover its value. In the criminal case his acquittal may have been due to the fact that the government failed to show, beyond a reasonable doubt, the existence of some fact essential to establish the offense charged, while the same evidence in a civil action brought to recover the value of the property illegally converted might have been sufficient to entitle the government to a verdict. Not only was a greater degree of proof requisite to support the indictment than is sufficient to sustain a civil action; but an essential fact had to be proved in the criminal case which was not necessary to be proved in the present suit." See also the case of *United States* v. *Schneider*, (C. C.) 35 Fed. 167.

The authorities are collected in 2 Black on Judgments (2nd ed.), sec. 529, from which we make partial quotation, as follows:

Section 529. *Criminal Sentences not Evidence in Civil Issues.*—Since the parties to a criminal prosecution and those in a civil suit are necessarily different, and as the objects and results of the two proceedings and the rules of evidence which apply to them respectively are equally diverse, it follows that the judgment

in the former cannot be used by way of estoppel in the latter, save for the single purpose of proving its own existence, if that becomes a relative fact.

In the case at bar the suit is not only civil in form, but the relief to which the plaintiffs are entitled is, in the view this court takes of the matter, civil and not penal or criminal in character. The gravamen of the suit at bar is that the defendant has not performed the duties required of it by statute and specific performance thereof is prayed for in the relief to which the plaintiffs are entitled in so far as they prove their case.

Counsel for the defendant rely upon the case of *Coffey* v. *U. S.*, 116 U. S. 436, 6 Sup. Ct. 437, 29 L. Ed. 684, as establishing a different rule. It is sufficient to say of that case here that it is clearly distinguished in the case of *Stone* v. *United States, supra,* and in our opinion has no application to the case at bar.

The other cases cited by counsel for the defendant on this point are, *Commonwealth* v. *G. W. Croushore,* 145 Pa. 157, 22 Atl. 807; *Chas. F. Durant* v. *David A. Williamson,* 7 N. J. Eq. 547; *Davidson* v. *Isham,* 9 N. J. Eq. 185, and *Bierer* v. *Huret,* 162 Pa. 1, 29 Atl. 98.

The case of *Commonwealth* v. *Croushore* express y holds an acquittal of the same defendant upon an indictment for maintaining a nuisance in obstructing a public highway is not a bar to a suit for an injunction on bill filed by the Commonwealth *ex rel* the Attorney-General, but merely a circumstance which will be considered by a chancellor in exercising his discretion to refuse the injunction.

The other cases cited were civil cases between the same parties in which the doctrine of *res adjudicata* was properly invoked, and have no application to the case at bar.

Further, in the case at bar the Norfolk and Western Rail*road* Company constructed the obstructions of the public road complained of and not the defendant, the Norfolk and Western Rail*way* Company, prosecuted in the criminal proceeding in question.

We are, therefore, of opinion that the plea of *res adjudicata* of the defendant is not sustained and that the plaintiffs are not estopped by the verdict in favor of the defendant in the criminal proceeding referred to from maintaining this suit.

We come now to the remaining point and inquiry:

6. Whether lack of contractual relations and lapse of time and laches bar the plaintiffs in this case?

Defendant contends that no contractual relations existed between the plaintiff and defendant whereby a court could venture to attempt to specifically enforce the doing by the defendant of more than it has already done, and that more than a generation has passed since the alleged changes, and, in substance, that the plaintiffs have been guilty of laches, and are thereby barred from maintaining this suit.

While it is true no such contractual relations existed, the legal duty on the part of the railway company existed, imposed by statute, to "make an equally convenient road." The railway company. having acted under such statute and assumed such legal duty, the court has jurisdiction to enforce the performance of that duty. It was expressly held by this court in the case of *N. & W. Ry. Co.* v. *Board of Supervisors of Carroll Co., supra*, that the proceedings in the county court which had been had in that case "did not take the matter from under the operation of this statute. When the railroad company made its proposition to build an equally convenient road, it did no more than the law required it to do before it could take for its

purposes the public road. And when the court in its order accepting the proposition set forth all the plans and specifications to be observed in building the new road, it was merely prescribing what would be regarded by it as a compliance with the statutory requirement to build an equally convenient road."

"A promise to perform a legal duty does not make it any the less a duty, nor does it transform the legal duty into a mere personal delegation.

"In the case of *City of Oshkosh* v. *Railway Co.*, 74 Wis. 534, 43 N. W. 489, 17 Am. St. Rep. 175, citing with approval *Jamestown* v. *Railway Co.*, 69 Wis. 648, 34 N. W. 728, it is said: 'In that case this court sustained a bill brought by the town to compel the railway company to restore a public highway, which it had practically destroyed in constructing its road, to its former condition of usefulness to public travel. The jurisdiction of the court was rested upon the ground that a court of equity would compel a railway corporation to perform the plain statutory duty of restoring the highway which it had invaded to its former state of usefulness, as a condition to using it for the purpose of its roadbed. This duty is imposed by statute by plain and positive language and a railroad corporation has no warrant in law to invade a highway with its track without complying with the law which grants the privilege to do so. It is contumacious and wrongful conduct for the officers of a railroad corporation to occupy a public highway with its track, practically destroying the street for purposes of public travel, and then defy or disregard all law and all authority invoked to compel them to repair the wrong which they have done the public. The courts would be impotent indeed if they could not correct such flagrant invasions of public right.' " *N. & W. Ry. Co.* v. *Supervisors of*

*Carroll Co., supra,* 110 Va. at pages 102, 103, 65 S. E. at page 534.

The plea of lapse of time and laches is equally untenable. As held in the case last cited and as stated in its syllabus:

"*Highways—Public Rights—Statute of Limitations —Laches.*—Public highways belong to the State, and the statute of limitations does not run against the rights of the public therein, nor does the doctrine of *laches* apply. As against the government, *laches* cannot be set up as a defense in equity any more than the bar of the statute can at law. Time does not run against the State, nor bar the rights of the public."

Upon the whole case, therefore, we are of opinion to reverse the decree of September 9, 1915, complained of, in so far as it did not hold, as it should have done, that the defendant railway company should construct the public road in its approaches on both sides of said railway crossing at Raven of the same width as the old public roadway in use by the public in 1888 or 1889, when the Norfolk and Western Railroad Company constructed that crossing, and of as easy grade as can be obtained by grading such road from Coal creek to the top of the railway at such crossing as the latter is approached from the direction of Doran, and of as easy grade as can be obtained from the top of such railway crossing as the public road leaves the same going west to Raven post office; to confirm the decree complained of in all other respects, with costs however to the plaintiffs as the parties substantially prevailing in this court; and to remand the cause to the Circuit Court of Tazewell county to be therein proceeded with in accordance with the views on the subject of said crossing at Raven expressed in this opinion.

*Reversed in part.*